**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEVEN DANIEL TODORIC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    **2:15cv1678** |
| | )    **Electronic Filing** |
| | ) |
| UPMC ST. MARGARET, | ) |
| | ) |
| Defendant. | ) |

<u>OPINION</u>

In this civil action, Plaintiff Steven Daniel Todoric ("Todoric") sued his former employer, UPMC St. Margaret for alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§951-963, after being fired from his position as a registered nurse. Pending before the court in the above-captioned matter is a motion for summary judgment filed by UPMC St. Margaret. Doc. No. 28. For the reasons that follow, the motion will be denied.

## I.    Factual Background[1]

Todoric was hired as a Professional Staff Nurse at UPMC Mercy Hospital ("Mercy Hospital") in October 2012 and remained in that position until early September 2014, when he transferred to UPMC St. Margaret (at times hereafter, "UPMC"). DCSMF ¶1.[2] On June 1, 2014, Todoric strained his back at work while lifting a patient. Id. ¶3. He spent most of the

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to Todoric, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[2] Citations to "DCSMF ¶___" refer to the Defendant's Concise Statement of Material Facts (Doc. No. 30) and Plaintiff's responses thereto (Doc. No. 34).

summer months performing light duty jobs at Mercy Hospital until August 22, 2014, when he was deemed recovered and discharged. *Id*.

While he was still on a light duty assignment at Mercy Hospital, Todoric applied for and was hired by Supervisor Shirley Brandon ("Brandon") as a Professional Staff Nurse in the Emergency Department at UPMC St. Margaret. DCSMF ¶4. Brandon knew at the time she hired Todoric that he had a back injury and had been on light duty assignments for most of the summer. *Id*.

Todoric worked for about eight weeks at St. Margaret but failed to complete the required orientation because, on November 10, 2014, he injured his back at home and went out on managed leave. DCSMF ¶¶4-6. Todoric remained on managed leave from November 10 to December 7, 2014. *Id*. ¶6. During this time, Lori Maggio ("Maggio") – a Leave Specialist with UPMC WorkPartners,[3] assisted Todoric with his leave of absence. *Id*.

Todoric eventually returned to work with certain physical restrictions that were initially set to end on November 30, 2014 but were later extended first to December 25, 2014 and then to February 28, 2015. DCSMF ¶7. Todoric's department at St. Margaret could not immediately accommodate his restrictions because their available light duty assignments required a minimum of six months on the job, which Todoric did not have. *Id*. ¶8. Instead, Todoric was given a light duty assignment at Mercy Hospital beginning December 8, 2014, and he remained in that position until January 19, 2015. *Id*. ¶¶8-9. During this time, Todoric was still considered an employee of St. Margaret's Emergency Department. *Id*. ¶9. He continued to report to Brandon and received his paychecks from St. Margaret. *Id*.

---

[3] UPMC Workpartners is a UMPC entity that manages disability-related services for UPMC employees. Steinkopf Dep. at 6:3-5, Doc. 36-5.

In January 2015, a light duty job became available at St. Margaret. DCSMF ¶10. Todoric was transferred to this light duty assignment on January 19, despite the fact that he had only two months' experience in his regular job and had not yet completed his job orientation from the previous September. *Id*.

On February 3, 2015, Todoric requested leave under the FMLA that would begin on February 18 for surgery related to his November 2014 injury. DCSMF ¶11. On February 4, 2015, Maggio sent Todoric a letter explaining the terms and requirements of the FMLA leave that Todoric had requested. *Id*. ¶12. In relevant part, the letter stated:

> While on leave, you are required to furnish us with periodic reports of your status and intent to return to work every 30 days. Should your anticipated return to work date be delayed, you are required to provide a 2-week notice to your supervisor of the change in your return to work plan so that schedules can be adjusted to cover your absence. . . .
>
> Also, please provide your supervisor, your human resources representative, and the Leave Specialist listed below with a telephone number where you can be reached while on leave. <u>It is imperative that this contact number be kept current throughout your leave period</u>. . . .
>
> NOTE: If your leave extends beyond the end of your FMLA or other job-protected leave entitlement, you will not have this right to reinstatement.

*Id*. (emphasis in the original).

Todoric underwent the planned surgery and remained on FMLA leave for approximately two months thereafter. DCSMF ¶13. During that time, Brandon, HR Manager Katelyn Printz ("Printz"), Maggio, and two other specialists with WorkPartners – Jeffrey Steinkofp ("Steinkopf") and Shannon Sorge ("Sorge") -- communicated with Todoric and with each other about Todoric's obligations and what was required so that Todoric could return to work when he was able. *Id*.

On March 2, 2015, Maggio sent Todoric a letter further explaining his FMLA leave and his duties and responsibilities for communicating with UPMC on an ongoing basis. DCSMF ¶14. The letter advised Todoric that his FMLA leave would be exhausted as of April 14, 2015 and that he would be denied further FMLA leave after that date. *Id*. The letter noted that Todoric could extend his leave beyond that date if needed but he would have to communicate with UPMC about this:

> In the event you require an extension of your leave, you may need to have an additional Certification of Health Care Provider for Employee's Own Health Condition form completed to qualify for the additional time away from work. Please contact me at the number listed below to obtain this form.

*Id*.

On March 23, 2015, Maggio sent Todoric a letter to remind him his FMLA leave would expire on April 15, and he therefore needed to return to work by that date in order to avoid being terminated. DCSMF ¶15. The letter provided detailed instructions, and enclosed forms, on how to request an extension of the leave of absence if Todoric could not return to work due to a disability. *Id*. The letter explained that the deadline for returning the paperwork for extended leave was April 6 and failure to return the paperwork by that deadline "could result in termination of [Todoric's] employment." *Id*. Maggio also attempted to leave a voice mail message for Todoric about the letter and the relevant deadlines. *Id*. Unbeknownst to Maggio, however, the voicemail she left was for a telephone number that was not Todoric's due to the fact that an intake employee at UPMC WorkPartners had inadvertently recorded Todoric's contact information inaccurately. Doc. 34, ¶15.

On April 9, 2015 at 12:57 p.m., Todoric called Steinkopf, his WorkPartners Disability Coordinator, to ask about his short-term disability benefits and payments. DCSMF ¶16. Steinkopf previously had promised to send a letter to Todoric to notify him formally of the

extension of his short-term disability payments through May 2, 2015. *Id*. Todoric informed

Steinkopf during their conversation that he had not received the letter but that he (Todoric) had

received a letter the previous week "saying my stuff is going to expire on April 15[th]." *Id*.

Todoric told Steinkopf, "I thought everything was extended through 5/2/2015, and that's when

[Steinkopf] said, oh it must be an old letter that popped out. He's like you're fine, your short-

term disability is extended through May 2nd." *Id*. Notably, Todoric's conversation with

Steinkopf occurred in the context of discussing short-term disability leave; Todoric did not tell

Steinkopf that the letter he was referencing was from Maggio or that it concerned FMLA leave.

*Id*. Following his conversation with Todoric, Steinkopf sent the letter to Todoric indicating that

his short-term disability plan "ha[d] been extended through 5/2/2015." DCSMF ¶21.

At 1:22 p.m. that same day, shortly after speaking with Todoric, Steinkopf sent an email

to Maggio explaining:

> I just spoke with Steven Todoric and he said it looks like he will be in PT until the
> end of this month and then a work hardening program through most of May so he
> doesn't anticipate being released until then. For some reason, I thought he was
> with Shannon for ATW, but that was his TRTW case. I asked him if he was
> working on leave with her but he had no idea. Can you send him his ADA papers
> again and/or call him and let him know we need that? He seemed confused about
> everything.

DCSMF ¶17.

On April 10, 2015, in response to Steinkopf's email from the day before, Maggio tried to

call Todoric and left the following voice mail message at the number she mistakenly believed to

be his:

> Hi, this message is for Steve. This is Lori from UPMC WorkPartners. I was
> calling because . . . Jeffrey Steinkopf had spoken with you and said you had some
> questions. . . regarding the ABA [sic] forms, the request for accommodation
> forms that I mailed to you. Uh, those forms are due as soon as possible because
> your 12 weeks, or your FMLA, will exhaust on 4/15, and so that would injure
> [sic] job protection. Those accommodation forms that I mailed to you . . . could

offer you additional protection under the Americans With Disabilities Act if you are unable to return to work on the 15th. So if you have any questions, please give me a call. My number is 412-667-7206; or if you can complete the forms as soon as possible and fax them to me at 412-454-8238. . . .

DCSMF ¶22.

On April 13, 2015, Sorge, the WorkPartners specialist for Todoric's light duty jobs, sent an email to Maggio asking Maggio to send the ADA extension paperwork to Todoric because she could see in the system that his FMLA leave was up on April 15. DCSMF ¶23. Maggio responded to Sorge the following day – April 14, 2015 -- in an email that stated:

I mailed Steven the ADA forms on 3/23. He has not submitted them as of yet and his leave will exhaust tomorrow (4/15). I left him a message on 4/10 explaining the importance of returning the form ASAP. As soon as I get them I will forward them to you.

DCSMF ¶24.

Maggio tried to contact Todoric again on April 20, 2015, unaware that she was leaving the following voice message at the wrong telephone number:

Hi, this message is for Steven. This is Lori from UPMC WorkPartners. I was just calling because . . . we still have not received the request for accommodation forms. . . . [T]hose are the forms that can offer you additional job protection. So if you could please fax those forms to me as soon as possible at 412-454-8238 or if you have any questions you can call me at 412-667-7206. . . .

DCSMF ¶25.

Two days later, on April 22, 2015, a number of emails were exchanged between or among Printz, Brandon, Maggio, and/or Sorge concerning Todoric's leave situation and employment status. Maggio first emailed Sorge at 7:22 a.m., stating:

I still have not received Steven's ADA request forms and his FMLA exhausted on 4/15. I have left him 3 messages about the ADA paperwork. I know you were in contact with him, did he say that he would be submitting the paperwork? If I do not receive it soon I will need to notify HR and his manager that his job is unprotected.

DCSMF ¶26. Sorge responded at 9:50 a.m. with an email stating, "I have not heard from Steven; please cc me on the email you send out to HR and his supervisor." *Id*. ¶27.

That same afternoon, at 3:15 p.m., Maggio sent an email to Brandon, Printz and Sorge, stating:

> Steven Todoric exhausted his 12 weeks of FMLA as of 4/15/2015. At this time, I must close out his FMLA file. Since the ADA forms were not returned, his job is currently unprotected. HR will need to manage his current time off and determine if his position will still be held. HR will also need to work with HRIS to reinstate him in PeopleSoft upon his return.

DCSMF ¶28. At 3:27 p.m., Printz emailed Maggio inquiring: "So as of 4/15 he is no longer protected?" Maggio responded at 3:39 p.m.: "That is correct. Attached is a copy of his FMLA exhaustion letter." *Id*. ¶29. The letter, which was sent to Todoric that same day (April 22, 2015), stated in relevant part:

> This is your final notice that as of 04/15/2015, you exhausted your available [FMLA leave] . . . . If you are unable to return to work on your next scheduled shift and have not initiated the accommodation process you may be removed from the UPMC payroll. . . . If you are unable to return to work on your next scheduled shift due to your own health condition and have initiated the accommodation process your request will be considered for additional job protection under the [ADA].

*Id*.

At 3:40 p.m. on April 22, Printz sent an email to Brandon asking, "Are we ready to terminate? I will need to get approval." DCSMF ¶30. Brandon responded two minutes later: "Most definitely." *Id*.[4] Printz then replied: "OK I will talk to [Manager] Stacey [Stange-Kolo] tomorrow." *Id*. Later that night, at 7:24 p.m., Brandon responded to an earlier inquiry by Printz

---

[4] The email actually indicates that Brandon responded, "Most defiantly." Doc. 36-16 at 1. Nevertheless, the parties appear to be in agreement that Brandon's intended response was "Most definitely." See DCSMF ¶30; see also Pl.'s Concise Statement of Material Facts at ¶28, ECF No. 35.

about the date that Todoric was expected back to work.  Doc. 36-15 at 1.  Brandon reported:

"The last e-mail I got he was extended to 5-2-15."  *Id*.

On the morning of April 23, 2015, at 8:36 a.m., Maggio called Brandon to discuss the fact that Todoric's FMLA leave had expired and his job was no longer protected.  DCSMF ¶31. Relevant parts of the transcribed conversation reveal the following exchange:

| | |
|---|---|
| Maggio: | So . . . his FMLA is what exhausted on the 15th of April and, um, he never submitted those request for accommodation forms, which could offer him additional job protection.  Not under FMLA but under the Americans With Disabilities Act.  Um, he never submitted them. You know, I left him three messages. |
| Brandon: | And I haven't heard from him in over a month and a half.  And he was religiously calling me . . . |
| Maggio: | Yeah . . . |
| Brandon: | Like once a week. . . . telling me what's going on and I haven't heard from him in a while. |
| Maggio: | Yeah.  I know Jeff [Steinkopf] talked to him and I guess he had some questions about the, the ADA forms, but, you know, Jeff had me give him a call. That was one of the messages I left him, but, um, you know, we we can't leave it open forever. . . . |
| Brandon: | Right. And he kinda fell off the face of the earth for everybody. |

*** 

| | |
|---|---|
| Maggio: | So, if you know, if at this point say somehow the paperwork would come in tomorrow, um, I would let you and, and Katelyn [Printz] know and find out how you wanted me to proceed, so, I mean, we won't process it, because its, its late now, so we would, you know, I would check in with you guys to find out what, what the situation was. |
| Brandon: | So, um, I'm kinda at that point like I'm ready to let him go.  I, I never got him off of orientation. |
| Maggio: | Okay. |
| Brandon: | Before all this started.  So, you know, if he woulda came back it woulda had [sic] been started from square one all over again. |

Maggio:        Okay.

Brandon:       Um, so, um, and I let Katelyn know that yesterday.

                                    ***

Doc. 31-2 at 3-4.

What happened next is disputed by the parties. UPMC contends that Printz met with her manager, Stacey Stange-Kolo, on April 23, 2015 to discuss Todoric's situation. According to UPMC, Printz and Kolo agreed that terminating Todoric's employment was the appropriate step and, to that end, they confirmed the decision to terminate that same day with Dave Patton, President of UPMC St. Margaret. DCSMF ¶32. Despite this, Printz and Brandon decided to wait a few days longer before acting on their decision in order to see if Todoric might submit the FMLA paperwork. DCSMF ¶33. Todoric disputes both that the termination decision was made on April 23 and that Patton was part of the decision-making group.

What is not disputed is that, on April 27, 2015, at 10:57 a.m., Printz emailed Brandon asking, "Has he called in? I will get approval for his term today." DCSMF ¶33. Brandon responded at 11:25 a.m. to say, "No calls for several months. He was calling once a week at first." *Id*.

At 1:09 p.m. on April 27, Todoric called Maggio and left a voice mail claiming he had just received her April 22 letter and stating "there was some confusion on my part as to how everything was being handled through FMLA and short-term disability and everything else. DCSMF ¶34. Maggio returned Todoric's phone call at 1:33 p.m. and explained to Todoric that his FMLA leave was already expired and his leave file had already been closed. *Id*. ¶35. Therefore, even if Todoric submitted his leave extension paperwork immediately, Maggio could not process it without permission from Todoric's department and HR representative. *Id*.

Nonetheless, Maggio told Todoric that if he would complete the papers he could go ahead and send them and she would check with HR and his department to see if they would accept them.

*Id*. Maggio made the following note about the call in her file:

> returned ee's call; he stated that he thought the FMLA/job protection were the same as the STD; he did locate the ADA forms and said he was going to complete them either this afternoon or tomorrow morning and would then email or fax them to me; I asked him to email them if possible as faxing will cause a delay; I advised that once the paperwork was rec'd I would have to get direction from the HR dept to process them; he stated that he understood.

DCSMF ¶36.

At 1:37 p.m. on April 27, Maggio sent an email to Printz, stating:

> I just spoke with Steven. He has the ADA paperwork and is going to either email or fax it to me ASAP. He thought that the FMLA and job protection was the same as STD. I did discover that we did NOT have the correct phone number for him so all of my attempts to contact him were in vain. If he submits the ADA paperwork do you want me to forward them to the Vocational Team?

DCSMF ¶37.

Two minutes later, at 1:39 p.m. on April 27, Printz called Maggio and the following discussion (in relevant part) ensued:

| | |
|---|---|
| Maggio: | WorkPartners. This is Lori. You're on a recorded line. May I help you? |
| Printz: | I, just, almost went in to terminate him today. |
| Maggio: | Did you? Well it's up to you guys. |
| Printz: | Well the problem with this kid is I swear he transferred here. Worked one day and we never seen him since. |
| Maggio: | Ha. Yeah. I mean, even though we had the wrong . . . phone number, I mean, he was getting . . . notices from us. Now, . . . it would have been nice to have the right number, . . . for when I was desperately trying to get hold of him . . . . Um, but we didn't. Um, so I mean it is really going to be up to you, how you |
| Printz: | Well . . . he transferred in September, and he went out on leave 11/10 and we have never seen him since. |

Maggio:      Yeah. Yeah, I mean it makes it hard.  I mean wasn't he working like a transitional . . .

Printz:      uh, huh.

Maggio:      I mean another department, right?

Printz:      Well, yeah.  He transferred from Magee . . . and he went back to Mercy.

Maggio:      Okay. Okay.

Printz:      So, do we have an option saying no?

Maggio:      Yeah.

Printz:      Alright.  We'd like to say no.

Maggio:      Okay.

Printz:      So at this point do we term him now?

Maggio:      You, I mean whenever you, you know are ready to do that.

Printz:      Alright.

Maggio:      You know. You would terminate him because he didn't get the paperwork in.

Printz:      Okay.

Maggio:      Yeah.  I mean its, that's your option.

Printz:      [unintelligible] manager I mean at this point he has even completed his orientation.  I think we're okay with it at this point.

Maggio:      Okay. Yeah, I'll just let him know if I get the forms that he, you know, if he has any questions, then, should I direct him to you, to HR or somebody else?

Printz:      Um, I would have him call his manager.

Maggio:      Okay.

***

Doc. No. 31-2 at 7-8.

Following her conversation with Printz, Maggio made the following notation in her file at 1:41 p.m.:

> spoke with Katelyn and she stated that they will be terming the ee; she asked if that was their option and I stated that it was; she stated to direct any questions from the ee to his manager.

DCSMF ¶39.

At 2:31 p.m. on the 27th, Printz sent Brandon an email instructing her to "[u]se 4/23/15 as the termination date." DCSMF ¶40. Brandon immediately acknowledged the instruction by return email. *Id*.

On April 28, 2014 at 11:54 a.m., Todoric emailed a PDF copy of the ADA leave extension paperwork to Maggio and also left her a voice mail message about the paperwork. DCSMF ¶41. Maggio returned Todoric's call at 12:20 p.m. and explained that his paperwork was too late, that HR and his department would not accept his late request, and that his employment had been terminated. *Id*. ¶42. Maggio then made the following notation in her file documenting the call:

> called ee about the ADA pw and advised that his HR dept has directed me NOT to process his req; advised him to talk with his manager or HR; he stated that he left a msg for HR yesterday but has not heard back from them; ee also asked how being termed would affect his health ins; advised that he would have to speak with HR about that.

*Id*.

After speaking with Maggio, Todoric spoke to Brandon, who informed him that "she had been advised by Human Resources to terminate [him] on [April] 23rd. Todoric Dep. at 109:14-15, Doc. 31-18. Todoric also spoke to Printz, who stated that UPMC couldn't accept his ADA

paperwork because it was too late.  PCSMF ¶54.[5]  Printz explained that the termination would be designated a "voluntary resignation for health reasons" so that Todoric would be eligible for rehire if he chose to apply when he was able to work.  DCSMF ¶44.

## II.     Procedural Background

Based on the foregoing events, Todoric commenced this employment discrimination lawsuit on December 21, 2015.  Doc. 1.  On May 27, 2016, Todoric filed his Amended Complaint, Doc. 18, which remains the operative pleading.  Count I of the Amended Complaint asserts a claim under the ADA for discriminatory discharge and failure to accommodate Todoric's disability.  Count II asserts an ADA claim for alleged retaliation.  Count III asserts claims under the PHRA for discriminatory discharge, failure to accommodate, and retaliation.

Following a period of discovery, UPMC filed the pending motion for summary judgment and related materials.  Doc. Nos. 28-32.  Todoric filed his responsive brief and supporting materials on February 13, 2017.  Doc. Nos. 33-36.  UPMC filed its reply brief and responses to Todoric's Concise Statement of Material Facts on February 27, 2017.  Doc. Nos. 37-38.  As a result of the foregoing, the issues are sufficiently joined and the motion is ripe for resolution.

## III.     Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  Celotex Corp. v.

---

[5] Citations to "PCSMF ¶___" refer to Plaintiff's Concise Statement of Material Facts (Doc. 35) and Defendant's responses thereto (Doc. 37).

Catrett, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV. Discussion

### A. Todoric's Claims Under the ADA

#### 1. Discriminatory Discharge/Failure to Accommodate

In Count I of the Amended Complaint, Todoric alleges that his rights under the ADA were violated when UPMC failed to accommodate his disability and terminated his employment. Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). Among the acts that can constitute unlawful discrimination are the following:

> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
>
> (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

*Id*. § 12112(b)(5)(A)-(B).

Here, Todoric's failure-to-accommodate and unlawful termination claims coalesce because Todoric asserts that he was precluded from returning to work as a result of the UPMC's failure to reasonably accommodate his disability.[6] The ADA's regulations recognize that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a

---

[6] Despite alleging that he was unlawfully discharged based on his disability, Todoric foreswears any intention of asserting a disparate treatment employment discrimination claim under the ADA. *See* Pl.'s Br. Opp. Def.'s Mot. Summ. J. at 3 n.3, Doc. 33. Consequently, the court need not conduct an analysis under the traditional burden-shifting paradigm outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973). Todoric characterizes his claim in Count I as an ADA failure-to-accommodate claim only, and the court will limit its analysis accordingly. *See Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014) (explaining that "[f]ailure-to-accommodate claims are distinct from claims of disparate treatment, and are not governed by the shifting-burden scheme set out in *McDonnell Douglas*").

reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999).

In this case, Todoric's failure-to-accommodate claim is predicated on UPMC's alleged failure to engage in the interactive process in good faith. In order to survive summary judgment on this type of claim, a plaintiff must point to evidence in the record sufficient to establish that: (1) he was disabled and the employer knew about the plaintiff's disability; (2) the plaintiff requested an accommodation or assistance for his disability; (3) the employer did not make a good faith effort to assist; and (4) the plaintiff could have been reasonably accommodated but for the employer's lack of good faith. *See Taylor,* 184 F.3d at 319–20; *Phillips v. Ctr. for Loss Vision,* Civil Action No. 3:15-CV-00563, 2017 WL 839465, at *12 (M.D. Pa. Mar. 3, 2017); *Bielich, v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 617 W.D. Pa. 2014).

For present purposes, UPMC does not dispute that Todoric was a "disabled" person within the meaning of the ADA or that it was aware of Todoric's disability. UPMC also does not dispute that a reasonable accommodation existed for Todoric in the form of a relatively brief extension of his medical leave.[7] *See McCall v. City of Phila.,* Civil Action No. 11-5689, 2013

---

[7] In February 2015, Todoric's physician estimated that he would be able to return to work by June 2, 2015, Doc. 36-7 at 3, but Todoric was eventually released to return to work as of May 18, 2015. Doc. 36-23. Brandon acknowledged in her deposition that schedules for the Emergency Department were made three months in advance. Brandon Dep. at 24:24, Doc. 31-21. As of April 9, 2015, Brandon was aware that Plaintiff would be claiming a period of disability at least through May 2, 2015, and she forwarded this information on to the individuals who did the Emergency Department's scheduling. Id. at 23:2-24:1. Brandon admits that UPMC would not have suffered any hardship by allowing Todoric to remain on leave through May 2, 2015. *Id*. at 36:8-11. In fact, UPMC's records indicate that, as of April 24, 2015, Todoric had not been scheduled for any shift in the Emergency Department between May 17 and June 13, 2015. Doc. 36-14.

WL 5823873, at *23 (E.D. Pa. Oct. 29, 2013)("Numerous courts have recognized that leave of absence for medical treatment may constitute a reasonable accommodation under the ADA.") (citing *Shannon v. City of Phila.,* No. Civ. A. 98-5277, 1999 WL 1065210, at *5 (E.D. Pa. Nov. 23, 1999), as setting forth a collection of cases on the point).

Instead, UPMC challenges the second and third elements of Todoric's case. In essence, UPMC denies that Todoric ever made a legitimate request for an accommodation prior to the termination of his employment. UPMC argues that, because Todoric never sought an accommodation, no jury could conclude that UPMC failed to render good faith assistance with regard to such request.

In support of this argument, UPMC relies on *Peter v. Lincoln Tech. Inst.*, 255 F. Supp. 2d 417 (E.D. Pa. 2002), wherein the district court granted the employer's motion for summary judgment on an ADA failure-to-accommodate claim. In *Peter,* the plaintiff took a self-described "disability leave" from her job, but she failed to advise her employer when she thought she would return to work, and she also repeatedly failed to submit medical documentation that would have demonstrated the need for a disability leave. The court ruled that the employer had no obligation to engage in the interactive process with the plaintiff because the plaintiff had never initiated that process by requesting an accommodation. 255 F. Supp. 2d at 437. In a footnote, the court rejected the plaintiff's argument that her employer's belated receipt of the physician's medical certification form should have been sufficient to initiate the "interactive process," even though it arrived after the plaintiff had already been terminated. *Id*. at 437 n. 7. Todoric interprets this aspect of the decision as setting forth *Peter's* "basic holding" – *i.e.*, "that the employer [has] no duty to go back, even if only a few days, to retract the termination of

17

employment and consider the plaintiff's late request" for disability leave.  Def.'s Br. Supp. Mot. Summ. J. at 17 n.10, Doc. 29.

The court is not persuaded that the facts of record or the reasoning of in *Peter* support an award of summary judgment in this case.  At bottom, UPMC's summary judgment argument rests on the factual assumption that Todoric was terminated on April 23, 2015 and never made a valid request for an accommodation prior to that point.  The conclusion is debatable, however, and reasonable minds viewing the record in the light most favorable to Todoric could conclude that UPMC's decision to terminate was not final until April 27, after Todoric had already communicated – and Printz and Brandon had already been informed of – Todoric's intention to imminently submit paperwork to request a further extension of his medical leave.

As discussed above, the evidence shows that, on April 22, 2015, Maggio notified Brandon and Printz that Todoric's FMLA leave had expired, his job was not protected under the FMLA, and the human resources department would need to determine if his position would still be held open for him.  DCSMF ¶28.  After Printz and Brandon agreed that they were ready to fire Todoric, Printz indicated that she would talk to her manager the next day to get the necessary approval.  *Id*. ¶30.  Although UPMC contends that Printz did, in fact, get approval on April 23 (thereby making the termination decision official), other evidence in the record supports a contrary inference.  It is undisputed, for example, that Printz and Brandon did not undertake any further course of action on April 23 and decided instead to wait a few days more to see if Todoric might submit his paperwork.  This suggests that no irrevocable decision had been made concerning Todoric's employment as of April 23.  The record also shows that Printz emailed Brandon on April 27 and remarked that she would "get approval for [Todoric's] term" that day, suggesting that she had not previously done so on the 23rd.  Later that day, Maggio informed

Printz by email that: (i) she had spoken with Todoric, (ii) he had completed his ADA paperwork and was planning to send it to Maggio "ASAP"; (iii) he had been confused about his responsibilities relative to requesting additional leave; and (iv) Maggio's prior attempts to reach Todoric by telephone had been "in vain," as she had been calling the wrong telephone number. Maggio and Printz then had a conversation about whether the anticipated ADA forms should be submitted for processing. During this conversation, Printz indicated that she "just, almost went in to terminate him today." Doc. 31-2 at 7. Printz inquired whether UPMC still had the option of "saying no" and whether "at this point . . . we term him now?" *Id*. at 7-8. Maggio indicated that Todoric could be terminated "whenever you . . . are ready to do that." *Id*. Printz confirmed "I think we're okay with it at this point." *Id*. Following this conversation, Maggio documented the file with a notation that Printz "stated that they will be terming the ee . . ." DCSMF ¶39. Printz subsequently instructed Brandon that she should "[u]se 4/23/15 as the termination date." Id. ¶40.

Viewing these collective facts in the light most favorable to Todoric, they could support an inference that no final decision was made concerning Todoric's employment until *after* Printz and Brandon had been notified that Todoric intended to imminently return his ADA paperwork for the purpose of requesting additional medical leave. Thus, the court cannot determine, as a matter of law, that Todoric was terminated on April 23, 2015 and that he never made any bona fide attempt to request an accommodation prior to that point.

In its principal brief, UPMC cites *Reeves v. Case Western Reserve Univ.*, No. 1:07-cv-1860, 2009 WL 3242049, at *12 (N.D. Ohio Sept. 30, 2009), along with other cases,[8] for the general principal that "when an employer has an established procedure for requesting an

---

[8] *See* Def.'s Br. Supp. Mot. Summ. J. at 15 n. 9 (citing additional non-binding authority).

accommodation, the employee must ordinarily avail herself of that procedure." Def.'s Br. Supp. Mot. Summ. J. at 15 (quoting *Reeves*), Doc. 29. Though never actually articulated in its brief, the proposition that UPMC seems to be intimating is that Todoric did not make a legitimate request for an accommodation because he failed to comply with his employer's established procedure for doing so – *i.e.,* Todoric failed to make a timely submission of the leave forms that Maggio had previously sent to him in her March 23, 2015 letter.

In this circuit, however, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor,* 184 F.3d at 313. "Either by direct communication or other appropriate means, the employee must make clear that [he] wants assistance for his . . . disability." *Colwell v. Rite Aid Corp.,* 602 F.3d 495, 506 (3d Cir. 2010) (internal quotation marks and citation omitted). "Indeed, '[t]he law does not require any formal mechanism or magic words to notify an employer that an employee needs an accommodation and circumstances will sometimes require the employer to meet the employee half-way . . . .'" *Id.* at 506-07 (quoting *Conneen v. MBNA Am. Bank, N.A.,* 334 F.3d 318, 332 (3d Cir. 2003)) (additional internal quotation marks omitted). At the same time, "[e]ven though the law doesn't require a set of 'magic words,' the plaintiff must make clear that [he] wants assistance." *McCall,* 2013 WL 5823873, at *24 (internal quotation marks and citation omitted) (second alteration in the original). "'[A]n employer cannot be faulted if the employee's actions or omissions during the interactive process cause the process's failure[.]'" *Colwell,* 602 F.3d at 507 (quoting *Taylor,* 184 F.3d at 317). In essence, "'courts must examine the process as a whole to determine whether the evidence requires a finding that one party's bad faith caused the

breakdown.'" *Id.* (quoting *EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789, 805-06 (7th Cir. 2005)).

Under the facts of this case, a reasonable jury could conclude that either party violated the duty to engage with good faith in the interactive process. Because genuine issues of material fact exist on that issue, this court cannot grant the pending motion for summary judgment on the basis that UPMC fully complied with the requirements of the ADA. Rather, the finder of fact must determine that issue at time of trial. UPMC's motion for summary judgment will therefore be denied relative to Count I of the Amended Complaint.

2. Retaliation

In Count II of the Amended Complaint, Todoric asserts an ADA claim based on the theory that UPMC discharged him in retaliation for his having requested a reasonable accommodation. Under the ADA, employers may not retaliate against employees who exercise their ADA rights. *See* 42 U.S.C. §12203(a) and (b).

Retaliation claims brought under the ADA are analyzed under the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805(1973). *See Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000); *Hair v. Fayette Cty. of Pa.*, No. 2:15CV341, 2017 WL 4023346, at *16 (W.D. Pa. Sept. 13, 2017) (citation omitted). Under this framework, a plaintiff must first make out a prima facie case of retaliation. *Shaner,* 204 F.3d at 500. Once he does so, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the challenged employment action. *Id.* (quoting *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir. 1999))*; Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant articulates a non-discriminatory motive, it then becomes the plaintiff's burden to prove, by a preponderance of the evidence, that the defendant's stated reason for the challenged action is a pretext for

unlawful discrimination. *Shaner,* 204 F.3d at 500 (quoting *Jones,* 198 F.3d at 410); *Fuentes,* 32 F.3d at 763. For purposes of surviving summary judgment, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764.

In this case, UPMC challenges Todoric's ability to establish either a prima facie case or a genuine issue of fact relative to pretext. To establish an initial prima facie case of retaliation, Todoric must show that: (1) he engaged in protected activity; (2) UPMC took adverse action after or contemporaneous with the protected activity; and (3) a causal link exists between Todoric's protected activity and UPMC's adverse action. *Shaner,* 204 F.3d at 500; *Krouse v. Amer. Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir. 1997). UPMC does not dispute the fact that Todoric suffered an adverse employment action when he was fired. Therefore, the second element of Todoric's prima facie retaliation claim is established as a matter of law.

Nevertheless, UPMC disputes the first and third elements of Todoric's prima facie case. For purposes of the first element, UPMC disputes that Todoric undertook any "protected activity" prior to the termination decision because, it argues, Todoric's request for accommodation in the form of an FMLA leave extension occurred only *after* the decision to terminate had already been made on April 23, 2015. Hence, UPMC contends that "no reasonable fact finder could conclude that Todoric engaged in any protected activity that could have formed the basis of its decision to terminate his employment." Def.'s Br. Supp. Mot. Summ. J. at 21, Doc. 29. Similarly, for purposes of the third element, UPMC argues that "it is impossible to prove a causal connection between Todoric's discharge and protected activity in which he never

engaged [prior to the termination decision]." *Id*. In essence, both of UPMC's arguments are predicated on its assertion that Todoric was fired on April 23, 2015 and that no valid request for an accommodation was made prior to his termination.

UPMC's argument is unavailing. For the reasons previously discussed, the court finds that there are genuinely disputed issues of fact in this case about when UPMC's termination decision actually occurred and whether Todoric commenced the "interactive process" prior to that time. Viewing the evidence in the light most favorable to Todoric, a jury could conclude that he was not terminated until April 27, 2015, after Printz had already learned of his intention to imminently submit ADA paperwork requesting an extension of his leave. A jury could also construe Todoric's communication of his intent to submit the paperwork as a good faith attempt to request further accommodation of his disability -- activity which is undoubtedly protected under the ADA. *See Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 191 (3d Cir. 2003) ("The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC. . . ."). A jury could similarly find that Todoric engaged in protected conduct when he sought, and was granted, a leave of absence commencing on February 19, 2015 following his back surgery. Thus, sufficient evidence exists to support the first element of Todoric's retaliation claim.

Todoric has also adduced evidence sufficient to satisfy the third element of his prima facie case. To establish the requisite causal link between an employee's protected conduct and the employer's adverse employment action, courts consider whether there is "unusually suggestive timing" between the two events. *See Ward v. Ingersoll-Rand Co.,* 688 F. App'x 104, 110 (3d Cir. 2017). Alternatively, courts can consider the circumstances as a whole, "including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives

for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) (addressing claims under the Age Discrimination in Employment Act, Title VII, and the PHRA).

Here, Todoric posits that Printz and Maggio terminated him because of his prior requests for – and use of – leave, which began on February 19, 2015 after he underwent back surgery. Todoric points to Printz's statements to Maggio that "the problem with this kid is . . . he transferred here, worked one day, and we've never seen him since." Doc. 31-2 at 7. Todoric also points to Brandon's statement that she was "most definitely" ready to fire him on April 22, 2015, despite her awareness that his short term disability status had been extended to May 2. Doc. 36-15 at 1; Doc. 36-16 at 1. Finally, Todoric points to Brandon's statements to Maggio that she was "ready to let him go" because she "never got him off of orientation" and, if he came back, "it woulda had [sic] been started from square one all over again." Doc. 31-2 at 4. Viewed in the light most favorable to Todoric, these statements could arguably support an inference that Todoric's termination was motivated, at least in part, by his absences from work. Because a jury could reasonably infer a causal connection between Todoric's prior use of leave as an accommodation for his disability and his subsequent loss of employment, the third element of his prima facie case is satisfied.

The court must next consider whether Todoric has produced sufficient evidence to establish a triable fact on pretext. Here, there is no dispute that UPMC has articulated a nondiscriminatory reason for its adverse employment decision – namely, Todoric's "failure to return to work following the expiration of his approved FMLA leave, not having submitted a

request for an accommodation in the form of an extension." Def.'s Br. Supp. Mot. Summ. J. at 22, Doc. No. 29.

To withstand summary judgment, Todoric "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Here, the court is satisfied that Todoric has done so. As discussed, a reasonable jury could reject UPMC's assertion that it fired Todoric prior to receiving any request for an accommodation. In addition, based on the aforementioned statements of Brandon and Printz, a jury might conclude that Todoric's termination was motivated by his prior use of leave as an accommodation for his short term disability. Because the evidence is at least minimally sufficient to support a finding of pretext, UPMC's motion for summary judgment will be denied with respect to Count II of the Amended Complaint.

### B. Todoric's Claims Under the PHRA

In Count III of the Amended Complaint, Todoric asserts claims under the PHRA based on the allegations that UPMC unlawfully fired him because of his disability, failed to accommodate his disability, and retaliated against him for requesting a reasonable accommodation. Courts in this circuit apply identical legal standards when analyzing claims under the PHRA and the ADA. *See Macfarian v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999); *Montanez v. Missouri Basic Wel Servs., Inc.,* 2017 WL 3701786, at *20 and n. 189 (M.D. Pa. Aug. 28, 2017). Accordingly, the Court need not conduct a separate analysis of Todorics' various PHRA claims.

For the reasons previously discussed, Todoric has adduced sufficient evidence to support his claims that UPMC failed to accommodate his disability and retaliated against him for protected activity. Consequently, UPMC's motion for summary judgment will be denied relative to Count III of the Amended Complaint.

## V.      Conclusion

For the reasons stated above, the UPMC's motion for summary judgment will be denied. An appropriate order follows.

<u>Date: September 29, 2017</u>

<u>s/David Stewart Cercone</u>
David Stewart Cercone
United States District Judge

cc:     Christine T. Elzer, Esq.
        John J. Myers, Esq.
        William S. Myers, Esq.

        (*Via CM/ECF Electronic Mail*)